May it please the Court again, Marty Schwartz and Mark Blumenthal for the Plaintiff's Appellant. The issue on appeal is whether there's questions of fact as to whether General Motors violated Nevada's Motor Vehicle Franchise Act and whether there's a question of fact as to whether General Motors violated the dealer agreement. The issue on appeal is not whether General Motors had good cause to violate the statutes or the contract or whether they had a compelling business reason or even if they acted in good faith. Those are not defenses to the claims that are on appeal. It was raised in the lower court, but we're not appealing those claims. And again, whether General Motors acted in good faith or not, that may explain their conduct, but it certainly for these claims doesn't excuse it. Counsel, what do we do with the fact that you did not file a timely challenge to the, after the notice was given to the director of whatever the Nevada Administrative Agency is, to give that agency an opportunity to conduct whatever administrative review it would conduct so that you've not exhausted your administrative remedies under the Nevada Motor Vehicle Act? No. It's our contention that GM was obligated to give that notice in December of 2000, 60 days prior, or November of 2000. It would be 60 days prior to the time General Motors announced that they were phasing out the automobile. But our case law says that until the actual announcement is made, there isn't an obligation to provide the notice, and the case law, or at least the record, suggests to me that the decision wasn't made until much later. Well, the decision to phase out Oldsmobile was announced in December of 2000. Right. After the contract was entered. Yes. The statute requires that a manufacturer provide 60 days notice before it takes any action that would modify the franchise. But what was the modification? I mean, business continued as usual. Your client on deposition said that there was never a car order that wasn't filled during the five-year term of the contract. I don't see the breach here that you're arguing modification on. Well, one provision that the announcement in December of 2000 said that they were no longer going to make new models and that they would just let the existing models expire at the end of their useful life or sooner if they fell below economic feasibility. But didn't they keep making new cars until the 05 model year? They made new cars. They did not make any new models in 05. They did not create any new models. They manufactured the existing models. Okay. That gets back to my question. I still don't see the modification here that they continue making cars. They supply all the cars that the dealer ordered. And as far as I can see, they lived up to their contractual obligation. Where is the modification? Two provisions in particular. One is under the dealer agreement, we had GM assured the dealer of a right to enter into a new agreement when the existing agreement expired. In perpetuity? Even if, as you say, for legitimate business reasons, General Motors decides that we can't afford to make Oldsmobiles anymore and we're shutting down the whole line? Well, it's not in perpetuity. All it means is at the expiration of that agreement, they have to give us an opportunity to enter into a new agreement. That new agreement did not have to have that same provision in there. It's not in perpetuity. It would be more like an option to renew. But if at the end of that five-year term there are no more Oldsmobiles being made because General Motors has made a rational business decision to shut down the entire line, I don't understand your answer to be anything other than an argument that you have a perpetual right to renew every five years. Well, we only we're only claiming a right to renew for five years. And that would be no different than any other contract, even for the sale of goods. If you sell a what? Excuse me? You have a right to another five-year contract to sell what? Oldsmobiles. So even though General Motors has made a sound business decision not to produce Oldsmobiles anymore, they have to produce them for your client or pay damages. And this would be no different than if someone was a supplier to General Motors and had a ten-year agreement and decided after five years it doesn't make economic sense. That doesn't excuse their breach of the contract. And, again, under these terms, these are what the parties agreed to. They could have provided in the agreement that if General Motors ceases to manufacture Oldsmobile, there is no right to renew. What they did do is – Well, there is some language, is there not, about market conditions and essentially GM gets to decide, you know, which vehicles get supplied to which dealers and that sort of thing? Well, they get to decide the mix of models. But in this case, there's nothing that suggests that they could stop providing all models and all automobiles. But the record does not show that in 2004 when your five-year contract came to an end that there were not several General Motors models that were available elsewhere in the United States to sell. Your argument is that they were obligated to continue making new Oldsmobiles. Isn't that it? Well, under the addendum that was part of the dealer agreement, they listed three passenger vehicles and two, I believe they called light-duty trucks. Right. By 2004, they were down to one passenger vehicle. Making. But my question is, as I understand the record, there were lots of vehicles elsewhere in the country. They only sold 276 of them in 2005. But if your client had wanted to continue selling the older models, there were still cars available. But I think your argument really is, notwithstanding the legitimate reason to shut down the line, they had to continue making cars for you. Well, under the agreement, that's exactly correct. And I don't find that outside the ordinary rules of commerce. If someone makes an agreement to supply for five years and then they decide or ten years and then they decide it's not economically feasible, that's not an excuse for nonperformance. I'd agree with you if the term was ten years. The problem is that they didn't stop making the models until after the five-year term had expired. And then they had to offer us an opportunity to renew that. Under the express terms, they assured us of an opportunity to renew it, provided that we performed under the dealer agreement. And there's no dispute we performed. Is there any obligation under the agreement for General Motors to offer your client the opportunity to sell a different line of General Motors product? No. There's no requirement that they be given the option to switch over to Pontiac or Buick or whatever? No. That was explored, but it was more in terms of a settlement than it was any type of contractual obligation. Counsel, what do we do with paragraph or Article 6.1, which is at N-18 of the record? It says many factors affect the availability and distribution of motor vehicles to dealers, including component availability and available production capacity, sales potential in the dealer's area of primary responsibility, varying consumer demand, and other conditions beyond the control of General Motors. General Motors reserves to itself discretion in accepting orders and distributing motor vehicles, and its judgments and decisions are final. And in this case, the decision was made to stop making Oldsmobiles because of varying market conditions and consumer demand. Well, 6.1, the opening paragraph provides they will furnish dealer with a motor vehicle addendum, which provides which motor vehicles they will make available. The addendum in the record shows the three passenger cars and two light-duty trucks. And is there any testimony that at the end of the period there were still vehicles available in those categories? Well, not new vehicles. Well, that's the sticking point. I mean, the problem is that your client, the only thing your client can say is I wanted a 2005 model and they wouldn't provide me with one because they weren't making them anymore. But there were, as I understand the record, there were still models available in all those categories. In fact, General Motors was offering to take back inventory from other dealers around the country that remained unsold at the time that they announced the decision to stop making them. However, throughout the agreement, at least in two or three different provisions, General Motors was to provide an opportunity for the dealer to get a reasonable return on its investment. And by saying that we're phasing out Oldsmobile and we're not going to be making new models and basically we want you to liquidate your inventory, that is certainly contrary to allowing the dealer the opportunity to make a reasonable investment. You wanted to save some time for your colleague to engage in rebuttal? Yes, sir. Very well. We'll hear from General Motors at this time. Mr. Lilley. Good morning, members of the panel. Good morning, Judge Hugg. Mark Lilley on behalf of General Motors. May it please the Court. With respect to the questions that were just asked and referring in particular to Article VI of the Dealer Sales and Service Agreement, Your Honor is quite right that it does vest discretion with General Motors. Consumer demand is one of the factors that applies. And the record as of today is still devoid of evidence that General Motors abused its discretion in that regard. The Court also asked questions about were cars made available. And I believe that the appellant here is conflating the idea of wishing that cars were available for order with whether cars were actually available for order. And the record evidence in the case is clear that this dealer never, ever placed an order for an Oldsmobile that was not filled, period. And when we look at Article VI.4.1 of the Dealer Agreement, the sole obligation that General Motors takes on is to make cars available. There's no evidence that it didn't. And, in fact, Your Honor pointed out that there were Oldsmobiles in inventory that were being repurchased by the company. And in Exhibit Q to the appellant's record on appeal, I refer to interrogatory answer 15 at page Q13, which states, General Motors has a special dealer website where new Oldsmobile vehicles are available for purchase to Oldsmobile dealers from GM. And such new Oldsmobile vehicles will continue to be available for purchase by Oldsmobile dealers for some time. There is no evidence in the record that this dealer ever attempted to avail itself of those available cars pursuant to the GM website. Lastly, to the extent there's any complaint about cars in 2005 not being available, this dealer had liquidated its business in either late 2004 or early 2005. The record reveals that it made a real estate play. It cashed in its sizeable real estate holdings. And, therefore, whether cars were available for its order in 2005 are really irrelevant. With respect to the motor vehicle. So they got more for the land, basically, is that what you're saying? Yes. The record reveals that he sold a number of dealerships in late 2004 and 2005 and received some $38 million. This is Mr. Scala? This is Mr. Scala who had these real estate holdings on Sahara Avenue in West Sahara in Las Vegas. A question was asked about what was the modification. And the answer is that there was no modification. The dealer agreement remained in full force, in effect, through its expiration in 2005. And, in fact, the December 12th and the December 14th, 2000 letters, which are in the record and advised the dealers of what GM's plans were going forward. And recall that these are letters that were issued in 2005 forecasting what would happen over the next four or five years. 2005. You meant 2000? The letters were in December of 2000. I'm sorry if I misspoke. You said 2005. And the record gets a little bit compressed here. But the fact of the matter is that the dealer remained in business through 2004, continuing to buy Oldsmobiles, sell Oldsmobiles, buy cars at auction, buy parks, service vehicles, so on and so forth. But the record evidence is clear that there was no modification to the dealer agreement. What's your response to counsel's argument about the renewal guaranteed a reasonable rate of return? Yes. I'm happy to address that. That's Article 4.1. And Article 4.1 appears in Article 4, obviously, which is entitled Dealer Locations. Article 4.1 cannot be read to impose an affirmative obligation on General Motors that the dealer is somehow entitled to some kind of a reasonable rate of return on its investment. Instead, what Article 4.1 says is, because General Motors distributes its products through a network of authorized dealers, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service GM products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment. That is not an undertaking by GM to provide a rate of return. And to make that particularly clear, if one looks at the next sentence, the next paragraph in 4.1, it actually does impose an obligation on General Motors. There it says, to maximize the effectiveness of its dealer network, General Motors agrees to monitor marketing conditions and strive to the extent practicable to have dealers in appropriate number, size, and location to achieve the objectives referred to above. The objectives that are being referred to are those that are in the first paragraph of 4.1. So you're saying we should read that clause as a promise that they would not grant so many franchises that the dealers would be stepping on one another. Correct. And, in fact, to that point, we refer in our brief to several courts that have so concluded. And I would refer the Court in particular to the Western District of Virginia, C&O Motors v. General Motors, in which the Court adopted the very interpretation of Article 4.1 that we are urging here. That was another Oldsmobile case. That case, by the way, was affirmed by the Fourth Circuit, albeit on different grounds, about three weeks ago. And Judge Mahan also had the benefit of a number of other slip opinions that are in docket record number 3, number 83 below, including opinions from Judge Kunauer in the Western District of Washington, Judge McCuskey in the Central District of Illinois. These are unpublished decisions? These are unpublished decisions in the Oldsmobile docket that were made a part of the record before Judge Mahan. And there is also a decision that was rendered after January 1, 2009? Yes. They were all post-phase-out decisions. Okay. And two other decisions, Judge Hawkins. One is Crippen Automotive v. General Motors, the only Michigan court to construe this paragraph. These are all in your brief? They are all in the record before Judge Mahan. The Hubbard opinion, which is out of the Northern District of Indiana, is very recent. That's August 1. So they're not in your brief? They're not cited in our brief to you. They are cited in the briefs to Judge Mahan below. What is before you is the Hubbard opinion that was filed with this Court on September 10th. And all of these opinions stand for the proposition that the language in Article 4.1 that the appellant is seizing on is aspirational only. Well, at the close of argument, fill out a gun sheet with the deputy clerk. A copy will go to your opponent, and I will give them an opportunity to respond. Very well, Your Honor. And, in fact, they cite some of these opinions themselves. Okay. To the extent they don't, they'll be given an opportunity to respond. Very well. Do you have anything else? Yes, I do. A question was asked about the modification argument. And one point that I — I'll move on with that — with that point. And, Your Honor, it's correct that no protest was ever filed. And under the State statute, that was a necessary predicate for any recovery under the Dealer Act. So they would — your argument is they would not be entitled to any damages because they didn't exhaust their administrative remedies? That is correct. That is correct, Your Honor. Okay. Mr. Choud, any questions? No, I don't. Thank you. Thank you for your argument. Rebuttal. Mr. Blumenthal. Your co-counsel laid up some of your time. You can make him pay for dinner. Good morning, Your Honors. I'd like to first go into the issue on the models having been stopped before the 5-year expiration date. I believe I heard, and I could be wrong, but I believe, Judge Tallman, you said that — but the models were not stopped before 5 years expired. And actually, they were stopped in April of 2004. So there couldn't be any new models in 2005. The last vehicle rolled off the plant, the assembly plant, in 2004. This is a new car dealer. These are new car dealer agreements. I may have misspoke, but as I understand the record, there were no new 2005 models built. Is that right? Yes, Your Honor. There were no new 2005 models built. And when did — the model year starts, what, in September, usually, in the fall? I can't tell you exactly. I would think you're probably correct. You don't watch much TV, counsel? I don't watch much TV, Your Honor. Okay. That's true. All right. With cases like this, there isn't a lot of time to watch TV. I can understand that. And I would also like to try to discuss very briefly the term of the agreement that's found on page N-1, which does allow the opportunity to enter into a new agreement. It uses the term that the dealer will be assured an opportunity. Well, when you go to page N-31, which is 15.2.1, this says that if the agreement expires or is terminated by dealer, which it was not, and General Motors does not offer dealer or replacement dealer a new dealer agreement. Now, the agreement, you could argue that it expired. But the only way, if you go back to the actual agreement, because basically the boilerplate was incorporated into the agreement itself. So if you go back to the term of agreement, which is on page N-1, the only way that the agreement could expire and GM not offer, under this particular provision, a new agreement would be if the dealer hadn't fulfilled its obligations and there's no record evidence that the dealer did not fulfill its obligations. Did your client ever ask GM to take back any of the inventory that it had? No, Your Honor, but December 12th. Actually, it didn't have any inventory at the end in 2004, did it? I believe it had some inventory, but we haven't looked at that. But it had sold the property by then, had it not? Well, in 2005, I believe it sold the property. I'm not sure of the dates. When did they stop operating the dealership, I guess is my question? Well, at the end of the agreement. That would be in 2005. But the fact that cars were available for order, that's a useless act. And in December of 2000, you're told that your dealership is now going, your brand of 100 years old is now going to be terminated forever. And it just seems, you know, that was an injured soldier at that point. And to begin to start ordering cars, there were 300,000 cars made in 2000, and there were 24,000 cars made in 2004. I think it's pretty obvious what happened to the investment of these dealers. It was completely destroyed as of 2000. That's why there was a modification in the agreement. The modification came about immediately because the renewal was taken away at that point. If you're going to phase out a brand, you can't go any further. I mean, 2005 ends, there is no further renewal. So there is no opportunity to renew. So the modification is gone at that point. And also the return on investment is shot because you can't transfer your dealership because nobody is going to buy it because you basically, at that point, have the commodity to sell that you didn't have the day before. So we're looking, it's somewhat of a simple case. If General Motors didn't have the right to do the things they did and modify the agreement without giving notice to the director 60 days before they made this notice to the world, it seems at that point that everything falls into place. Good Cause doesn't enter into it at all because it's a statutory violation. I think I've used my time up. Is it your view of the dealership agreement that there is a perpetual right to renewal? And if it's not renewed, then you're entitled to damages? Is that the gist of the argument? Your Honor, thank you for that question. There is no perpetual right to renewal. There is an opportunity that is assured to be renewed of this agreement. This is a five-year agreement. If General Motors would have wanted to have stopped the opportunity in the 2000 agreement, they could have said there will be no further renewal unless A, B, C, or D is met. Or if we're going out of business, then you're not going to get to renew. But there is absolutely no perpetual right to renew. The damages come. I'm sorry. I'm sorry. Doesn't your view of it that it has to be renewed on the same terms as the previous one? No, Your Honor. And that's just the answer to the last question. It could be renewed, but General Motors could – well, they do. This is an agreement that you don't negotiate. They put it in front of you, and they say sign it, and you sign it. You do not get to negotiate this agreement. So they could have put any terms into this agreement they wanted to, and in the renewal agreement, they could have said we are not going to renew further. So absolutely no perpetual right to renew. You are assured of an opportunity to renew, which was taken from them on December 12, 2000. Wait a minute. Assured of an opportunity to renew, but to renew what? I'm sorry, Your Honor. I apologize. If an agreement, as you suggest, is offered by General Motors that doesn't have any provision about many of the things that you want, then, as I understand your view, it's all right. General Motors could have offered a dealership agreement that said we're not going to produce – furnish you any new Oldsmobiles. Your Honor, you're correct. I've been practicing franchise law for 30 years, and I've seen franchise agreements that are renewed, and the franchisor says – I'm sorry, 28 years. The franchisor says your territory is now one-third of what it was before. Take it or leave it. That happens all the time, Your Honor. But in this particular agreement, and it's very clear, it says an opportunity to enter into a new agreement at the expiration date. There was no new agreement. There was no opportunity to renew. There was a useless act by General Motors sending a letter after every Oldsmobile had rolled off the plant in 2004. Later that year, in October of 2004, General Motors sent letters to the dealers saying we are not going to renew you. Well, that wasn't much of a surprise, was it? I mean, we were already in litigation for a year and a half and passed a motion to dismiss. So it's a different issue with regard to the administrative remedy, but I absolutely emphatically say there is no perpetual right to renew stated in the agreement. I think that's the fourth time you've told us that. You're five and a half minutes over your time. Do you have any other questions, Judge Hunt? No. Okay. Thank you very much. Thank you both for coming in today. Very interesting question. It will be submitted for decision.
judges: Hug, Hawkins, Tallman